FILED
09/08/2021
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 10, 2021 Session

**STATE OF TENNESSEE v. STEPHEN C. WALLICK**

**Appeal from the Circuit Court for Dickson County
No. 2016-CR-504 Suzanne Lockert-Mash, Judge**

_____

**No. M2020-01121-CCA-R3-CD**

_____

A Dickson County jury convicted the defendant, Stephen C. Wallick, for the Class B felony of theft of property valued over $60,000 but less than $250,000. The trial court imposed a sentence of eight years in the Tennessee Department of Correction, suspended to supervised probation, and ordered the defendant pay $60,000 in restitution. The defendant filed this timely appeal, challenging the evidence supporting his conviction. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and CAMILLE R. MCMULLEN, JJ., joined.

Jerred Creasy (at trial), Charlotte, Tennessee, and Michael J. Flanagan (on appeal), Nashville, Tennessee, for the appellant, Stephen C. Wallick.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Ray Crouch, District Attorney General; and Carey J. Thompson and Jennifer Stribling, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

*Procedural and Factual History*

The theft at issue stems from the contractual relationship between the defendant, Stephen C. Wallick, and the victim, Blankenship CPA Group, PLLC ("the Firm"). At trial, the State presented testimony from several of the Firm's employees who detailed the

relationship between the parties and their discovery of the defendant's theft. A summary of their testimony follows.

In March 2012, the defendant was an accountant in Dickson County and maintained an established book of business. The defendant decided to sell his accounting practice and entered into negotiations with the Firm. The negotiations continued for several months and resulted in an asset purchase and employment agreement. As applicable to this appeal, the terms of the agreement established that the Firm was to pay the defendant $158,000 over a period of three years for the defendant's assets, or client list, and for his work production, or net billings, at an established rate. Though the agreement was never signed, the defendant agreed to the terms in an email to CJ Blankenship, the Firm's managing partner, and the parties operated under the terms of the agreement for the next three years. During this period, the defendant received over $200,000 in compensation and $158,000 for the purchase of his practice.

Approximately one year into the agreement, however, "performance issues" arose between the defendant and the Firm. The issues culminated in the defendant's resignation on November 30, 2015. In his resignation letter, the defendant asserted that he was not contractually obligated to the Firm, stating: "I have never been provided a contract or signed anything that contractually binds me to continue. The terms negotiated have never been fulfilled and at this point I have significant doubts that they will ever be honored."

When the defendant resigned, the Firm had just over $60,000 in outstanding accounts receivable for work performed by the defendant. According to Mike Walters, the managing director of the Firm's Dickson office, the Firm paid the defendant for the work he completed for these clients. The Firm, therefore, began contacting the clients in an effort to collect the outstanding balances and discovered the clients had "either already paid their bill or bartered away the bill" with the defendant.

This discovery led to an investigation conducted by John Ethridge, a criminal investigator for the District Attorney's Office for the 23rd Judicial District. On March 9, 2016, Mr. Ethridge executed a search warrant at the defendant's office and seized "computers, external drives and an assortment of documentation." The seized items were forensically examined by Regional Organized Crime Information Center (ROCIC), "a private organization that receives funds from the federal government to aid in crime protection and investigation." The forensic examination revealed that the defendant downloaded client data files from the Firm's server and made unauthorized copies of the information. In addition, the defendant extracted a "client list" from the Firm's tax software upon which he made notations "indicat[ing] what was potentially collected from those clients." Mr. Ethridge also subpoenaed the defendant's records from First Federal

Bank which showed numerous cancelled checks that had been deposited into the defendant's account and that an escrow account existed, though the account was empty.

Mr. Walters reviewed the defendant's subpoenaed bank records and determined "that there were payments that were for clients that [the Firm] had purchased and [the Firm] had billed, and they did not pay [the Firm], but they paid [the defendant]." Mr. Walters found cancelled checks "for a substantial portion" of the accounts receivable which had been deposited into the defendant's bank accounts. He stated some of the checks "were actually made out to Blankenship CPA Group" and some were made out to the defendant. Mr. Walters compiled a spreadsheet which summarized the defendant's bank records, pertinent invoices, accounts receivable ledgers, and cancelled checks. Mr. Walters also created a worksheet documenting the invoices issued by the Firm to the clients at issue, if the invoices had been paid, how the invoices had been paid, and who collected the payments. Mr. Walters' spreadsheets and the defendant's "client list" were entered into evidence.

From the spreadsheet, Mr. Walters identified specific examples of clients who did not pay the Firm for their issued invoices, including: Underdawg Construction, U.S. Plumbing/Donna Story, Maynard Construction, Kingston, Inc., the Estate of Rosalee Lieberman, Martin Sir, Bodie Youngkin, and John Pruitt. Mr. Walters also identified the "client list" which "was where [the defendant] was keeping track of the payments that were made to him by his clients." Though the defendant claimed he deposited the collected money into an escrow account, Mr. Walters stated the defendant did not actually do so as the account was actually overdrawn by $12.50.

After reconciling the defendant's "client list" with the Firm's invoices and accounts receivable, Mr. Walters concluded the defendant collected $62,417.90 in accounts receivable that belonged to the Firm. According to Mr. Walters, the defendant collected payments totaling $12,885, and arranged for payments or bartered services for an additional $49,532.90. Jonathan Blankenship worked in collections for the Firm and provided an example of the defendant's bartering, stating a client informed him that "they had exchanged [accounting services] work for brick work on [the defendant's] house." Trudi Hayes, an administrative assistant, prepared bills on behalf of the defendant and testified that he asked her to remove invoices from the books that had already been issued to clients. Ms. Hayes explained, "There was one instance where there were two clients that [the defendant] had, that he told me he had bartered with them to do sewer line fieldwork at his house." The defendant told Ms. Hayes "to give him the invoices and he would pay it, because he had told them he would swap out the work or barter it, whatever." The defendant "eventually asked [Ms. Hayes] to write those balances off," but she did not do so. According to Ms. Hayes, the defendant never paid the invoices.

After resigning, the defendant made several complaints to his former colleagues regarding the Firm's attempt to collect the accounts receivable. The defendant called Jonathan Blankenship numerous times "and told [Jonathan] to stop talking to these people, because they're his clients." In an email sent by the defendant to CJ Blankenship on December 17, 2015, the defendant stated he prepared for "14 months to get ahead of this situation. I understand you are attempting to collect the [accounts receivable]. There are a few still out there that I have not contacted but I have 58K in payments, promises, or terms." In a text message sent on January 25, 2016, to Chris Griffin, a tax partner for the Firm, the defendant stated: "Chris, a call made by an unknown is prompting clients to call me. I have clients annoyed at Blankenship. I've collected almost $52,000; the majority are on post-dated." Though the defendant believed the accounts receivable were his to collect, Mr. Griffin stated the accounts receivable belonged to the Firm.

The State also presented testimony from three clients who paid the defendant directly for accounting services he performed prior to his resignation, including Timothy Rampaul, Laurel Joslin, and Donna Story. During Ms. Story's testimony, confusion arose as to whether she bartered with the defendant because after the defendant resigned, Ms. Story told one of the Firm's employees that she exchanged septic work for the defendant's accounting services. During trial, however, Ms. Story testified that while she did perform over $2000 worth of septic work for the defendant and he performed accounting services for her, she paid the defendant directly for his services and did not "trade[] septic work."

The State then rested its case-in-chief, and the defendant moved for a judgment of acquittal. The trial court denied the motion after which the defendant presented testimony from Clayton Cooper, a certified fraud examiner and retired federal investigator for the Department of the Treasury. Mr. Cooper testified as an expert, stating he reviewed voluminous financial records and determined the Firm underpaid the defendant for the purchase of his assets and work production. In reaching his conclusions, Mr. Cooper used several alternative calculation methods based upon his understanding that the Firm did not make pro rata adjustments to its invoices. However, Mr. Cooper acknowledged that the Firm paid the defendant $158,000 for his assets over a three-year period. Mr. Cooper's report was entered into evidence.

The defendant also testified, stating he has practiced as an accountant for twenty-one years and in August 2012, entered into an asset purchase and employment agreement with the Firm. However, a formal agreement was never signed by either party, and as a result, in 2013, the defendant still did not know the terms of the agreement. The defendant believed he would be paid "40 percent of the cash collections for the purchase side" and "50 percent for cash collections on the salary side." The defendant stated, "So, basically, I should have gotten 90 percent of the cash during the time they were buying my practice."

- 4 -

The defendant grew frustrated because "the numbers never seemed right," so he attempted to meet with CJ Blankenship "to finish my agreement and settle up." According to the defendant, however, the agreement was never finalized, and because he was not satisfied with the arrangement, the defendant sought legal counsel in 2014. The defendant felt he had "made a huge mistake and [the Firm was] trying to steal my practice." The defendant sought the advice of counsel about how to "get out of this mess" but continued working for the Firm until his resignation on November 30, 2015.

Upon resigning, the defendant believed the Firm owed him approximately $172,000. The defendant also asserted that he "never sold my clients, because we never finalized the contract." Because the defendant did not believe he and the Firm finalized the agreement, the defendant testified, "I honestly believe that I'm either a co-owner at 50-50, or I own 100 percent of my clients, based on what the Williamson County Court rules."[1] Furthermore, the defendant explained he was not a salaried employee but "was more like a contract employee," and, according to the defendant, the Firm collected approximately $433,000 from his work product though he was only paid $363,255.60. The defendant stated, "[b]ased on my numbers, they made $75,000 for doing absolutely nothing."

The defendant admitted that after he resigned, he collected approximately $28,000 in accounts receivable from his clients in November and December 2015. The defendant explained: "It was my intent to collect that to protect that money. And I believe that I'm owed much more than the amount that I was trying to protect." Though the defendant disputed collecting over $60,000 in accounts receivable and provided explanations for some of the payments at issue, he admitted to generating "an accounts receivable report," or the "client list," which reflected the outstanding accounts receivable he had at the time. Based on the report, the defendant "had promises on 58-grand" and deposited checks totaling $28,031.20 as reflected on the "client list." The defendant, however, stated not all of those deposits were related to outstanding accounts receivable and disputed some of the deposited checks as presented by the State, including checks issued by: Kim and Fayetta Wilcox, Martin and Anna Sir, Donald and Kelly Dillingham, Numatix, Inc., Dillingham Trucking, Inc., Kyle J. Gross, Lee E. Witherow, Sir & Smith, PLLC, White Bluff Imagination Station, Joann Jackowski, Side-by-Side/Charles and Jackie Franklin, and Perfect Pig, Inc.

During cross-examination, the defendant explained he has a work history in fraud and experience working with accounts receivable. The defendant stated during their three-year relationship, the Firm paid him $158,000 for the purchase of his assets and paid him

---

[1] At the time of trial, a civil case between the parties was pending in Williamson County.

a salary of $204,833. The defendant, however, maintained he did not have an agreement with the Firm according to advice he received from various attorneys.

In regards to the spreadsheets produced by Mr. Walters, the defendant acknowledged that he "[c]ollected – had promises to collect, or had terms" for the invoices listed. However, the defendant denied collecting $60,000, stating he only collected about $28,000. The defendant again asserted that the Firm did not fully pay him for his assets, and as a result, the Firm did not own the accounts receivable upon which he collected. Instead, the defendant suggested the Firm paid him for "[m]aybe renting" his clients and that the Firm still owes him $172,000 "[b]ased on cash collections." The defendant acknowledged that he had planned to resign and take his clients with him for about fourteen months prior to doing so.

Regarding the accounts receivable at issue in this case, the defendant stated, "I collected money, yes, to protect it, sir." The defendant claimed he put the collected money into an escrow account at First Federal Bank which is now closed. The defendant testified that he is "owed significantly more on every option and scenario than what was in there." The defendant admitted that he "took money" but stated, "[w]ho owns that money is still to be determined."

After the defense rested, the jury returned a guilty verdict for theft of property valued over $60,000 but less than $250,000, a Class B felony. At the subsequent sentencing hearing, the trial court found the defendant to be a Range I, standard offender and imposed a sentence of 8 years suspended to supervised probation. The trial court ordered the defendant to pay restitution in the amount of $60,000 based upon the proof presented at trial and to complete 100 hours of public service. The trial court also prohibited the defendant from contacting "any principal, employee, staff member, or family member of a principal or employee of Blankenship CPA Group." The defendant filed a motion for a new trial which was denied by the trial court, and this timely appeal followed.

## *Analysis*

The defendant argues the evidence is insufficient to support his theft conviction because nothing in the record demonstrates the theft amounted to $60,000 or more.[2] The State disagrees. When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable

---

[2] While there was extensive testimony by the defendant concerning the purchase agreement or lack thereof, when asked if that was an issue on appeal during oral argument, the defendant informed this Court it was not. Rather, the only issue before this Court was the amount of the taking.

to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn.

2006)).  This Court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact.  *Id.*

"A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent."  Tenn. Code Ann. § 39-14-103(a).  "Our supreme court has noted that although the statute defining theft does not contain 'an element regarding the value of the property stolen,' the property's value should be included in the indictment, and its value 'must be determined in order to establish the grade of the theft offense.'"  *State v. Moats*, No. E2019-02244-CCA-R3-CD, 2020 WL 6392483, at *3 (Tenn. Crim. App. Nov. 2, 2020), *appeal denied* (Mar. 17, 2021) (quoting *State v. Jones*, 589 S.W.3d 747, 756 (Tenn. 2019) (internal citations omitted)).  "Whenever a determination of value is necessary to assess the class of an offense in this code or the level of punishment, the determination of value shall be made by the trier of fact beyond a reasonable doubt."  Tenn. Code Ann. § 39-11-115.  Theft of property valued at $60,000 or more but less than $250,000 is a Class B felony.  Tenn. Code Ann. § 39-14-105(a)(5).

Here, the presentment alleged the defendant stole $60,765.45[3] from the Firm.  At trial, the State presented proof showing the defendant entered into an asset purchase and employment agreement with the Firm in 2012.  The terms of the agreement provided, in part, that the Firm pay the defendant $158,000 for the purchase of his clients and compensate the defendant for his work production.  For the next three years, the parties operated under these terms until the relationship between the defendant and the Firm soured, resulting in the defendant's resignation on November 30, 2015.  When the defendant resigned, the Firm had approximately $60,000 in outstanding accounts receivable for work performed by the defendant.  In an effort to collect the balances, the Firm discovered the defendant was collecting, "in payments, promises, or terms," the outstanding accounts receivable by instructing clients to pay him directly, in cash or bartered services, for the accounting work he performed while employed by the Firm.

A forensic examination of the defendant's computers revealed that he downloaded the Firm's client files without permission and created a "client list" documenting his theft.  In a spreadsheet, which was entered into evidence, Mr. Walters reconciled the defendant's

---

[3] The defendant takes issue with the presentment, noting it alleged two different amounts for the theft, "six thousand seven hundred sixty-five dollars and forty cents" and "$60,765.45," and suggesting "that it is common knowledge that a bank would not cash a check where the amounts are different and would, in fact, give priority to the written word."  The defendant also asserts the presentment did not list the correct theft statute, and as a result, "allege[d] [he] violated a statute that does not even exist."  However, it is clear from the record these were merely clerical errors.  Both during trial and at sentencing, all of the parties operated under the correct theft statute and valued the amount of the theft at more than $60,000 but less than $250,000.

- 8 -

"client list" with the Firm's invoices and accounts receivable and testified that the amount stolen by the defendant totaled $62,417.90. The defendant testified that he "[c]ollected – had promises to collect, or had terms" for the client invoices listed on the spreadsheet. The defendant's bank records showed numerous cancelled checks from clients totaling $12,885 that were deposited into his personal bank accounts, and the defendant admitted to collecting approximately $28,000 from the clients. Mr. Rampual, Ms. Story, and Ms. Joslin testified that they paid the defendant directly for the accounting work he performed on their behalf.

From these facts, a rational trier of fact could have found the defendant guilty of theft of property valued over $60,000 but less than $250,000 as the record makes clear the defendant intended to deprive the Firm of the outstanding accounts receivable and exercised control over the same. As noted, the defendant admitted to taking funds and compiling a "client list" documenting the monies or services he collected from the clients for the work he performed while employed by the Firm. The State provided testimony from numerous of the Firm's employees who detailed the manner in which the defendant stole approximately $62,417.90. Though the defendant disputed the amount of the theft alleged by the State and testified that he believed the outstanding accounts receivable were his property, the jury, as the trier of fact, is entrusted with determining the value of the theft, the weight of the evidence, and evaluating the credibility of witnesses, and, based on the verdict, the jury reconciled the conflicting proof in favor of the State. Tenn. Code Ann. § 39-11-115; *Campbell*, 245 S.W.3d at 335; *Dorantes*, 331 S.W.3d at 379. This Court will not reweigh the evidence. *Dorantes*, 331 S.W.3d at 379. Accordingly, the evidence was sufficient for a jury to convict the defendant of theft of property valued over $60,000 but less than $250,000.

The defendant also suggests the trial court's imposition of $60,000 in restitution demonstrates that the court "failed to find the amount of the theft was $60,765.45," as alleged in the presentment. The State asserts the amount "was based on the [Firm's] loss which comes from the jury's verdict" and "the trial court's decision to impose restitution less than the amount found by the jury does not militate or undermine the jury's verdict," and we agree. As explained above, the State identified over $60,000 in accounts receivable stolen by the defendant. At both trial and on appeal, the defendant admitted to taking the funds in an effort to protect himself and because he felt he was entitled to them. At the sentencing hearing, Mr. Griffin testified the Firm filed an insurance claim for the stolen funds and received an insurance payment of $55,000. Based upon this testimony, the trial court acknowledged a subrogation claim existed on behalf of the insurance company but ordered the defendant to pay restitution directly to the Firm. In determining the amount of restitution to be paid, the court stated it did not factor the insurance proceeds into its decision and instead, imposed $60,000 in restitution based upon the evidence presented at

trial, noting "the amount that was taken was $60,000."  Thus, we are not persuaded by the defendant's argument, and he is not entitled to relief.

### *Conclusion*

Based upon the foregoing authorities and reasoning, the judgment of the trial court is affirmed.

_____
J. ROSS DYER, JUDGE

- 10 -